UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

JASON GROTHJAN,

    Plaintiff,

    v.       CAUSE NO.: 3:17-CV-83-PPS-MGG

DR. TAYLOR, et al.,

    Defendants.

## OPINION AND ORDER

Jason Grothjan represents himself in this Eighth Amendment claim of deliberate indifference against Dr. Taylor and Dr. Eichman for his mental health treatment at the Westville Correctional Facility. The defendants moved for summary judgment, arguing they treated Grothjan properly, in accordance with their medical judgment. Grothjan responds that Dr. Eichman mismanaged his medications and that Dr. Taylor failed to personally see him or to provide appropriate housing and therapy. But because these are merely disagreements with Grothjan's course of treatment that do not rise to the level of deliberate indifference, summary judgment is warranted in this case.

## Factual Background

Dr. Barbara Eichman worked as a psychiatrist at the Westville Correctional Facility. ECF 104-2 at 1-2. With respect to Grothjan's medical care, her role was to manage medication for his mental health. *Id.* at 5-9. She was not involved in housing decisions or medication administration. *Id.* at 4, 9.

Dr. Eddie Taylor worked as the lead psychologist at the Westville Correctional Facility. ECF 104-4 at 3. He supervised the mental health program in a primarily administrative role and did not see patients on a regular basis but only if another mental health professional was not available. *Id.* While Dr. Taylor could make recommendations for housing assignments and transfers, the correctional staff ultimately made those decisions. *Id.* at 7-8. Group therapy was not available in restrictive housing. *Id.* at 17. Dr. Taylor could not prescribe medication and was not responsible for medication administration. *Id.* at 5. He recalls receiving letters from Grothjan about his mental health treatment and forwarded those letters to Grothjan's counselors for them to address his concerns. *Id.* at 20-21. He also followed up with Grothjan's counselors at mental health staff meetings. *Id.*

In support of the motion for summary judgment, the defendants submitted affidavits, medical records (spanning 713 pages), and disciplinary records. Although laborious, I have attempted to distill the information in these documents in my recitation below. Suffice it to say that the records show anything but deliberate indifference; far from it. They demonstrate an active effort to treat Mr. Grothjan's mental health issues. Here's what occurred set forth in a chronological fashion:

On June 3, 2016, Grothjan transferred to the Westville Correctional Center with diagnoses of depression and panic disorder, and he had prescriptions for mental health medication including Remeron, Paxil, and Buspirone. ECF 104-3 at 399-412. On intake, Grothjan reported a suicide attempt in 2015, but denied any current suicidal intent. *Id.* at 401. On June 11, Grothjan submitted a request to discuss his mental health treatment,

and a counselor scheduled an appointment. *Id.* at 562. On June 15, Dr. Eichman renewed his prescription for Buspirone. *Id.* at 388-89. A week later, Grothjan submitted a request to discuss his medication due to his discomfort in an open dormitory, and a counselor scheduled an appointment with Dr. Eichman. *Id.* at 552. On June 26, Grothjan submitted a request to speak with a psychiatrist, and a counselor responded that an appointment had been scheduled. *Id.* at 551. On June 27, Grothjan missed an appointment with Dr. Eichman due to a conflict with his schedule. *Id.* at 376-77. On June 28, Grothjan was moved to restrictive housing for assaulting an officer and stated that he had no thoughts of suicide. *Id.* at 327, 373-75. On June 30, he submitted a request for a new housing assignment, and a counselor responded that correctional staff determined housing assignments. *Id.* at 550.

On July 12, 2016, Dr. Eichman saw Grothjan for medication management. *Id.* at 356-58. Grothjan told Dr. Eichman that he was psychotic, but Dr. Eichman found his reports inconsistent with psychosis, noted he had no history of psychosis, and described him as someone who was simply seeking medication. *Id.* She also informed Grothjan of the potential side effects from anti-psychotic medication, including tardive dyskinesia. *Id.*; ECF 104-2 at 5. Dr. Eichman ultimately increased the dosage of Paxil based on his complaints of constant anxiety. ECF 104-3 at 356-58.

On July 15 and 22, a counselor met with Grothjan at his cell, but could not meet with him on July 29 because he was in the law library. *Id.* at 345. On July 31, Grothjan submitted a request to replace his prescription of Paxil with Effexor, and a counselor

3

responded that he was scheduled to see Dr. Eichman for a follow-up in October. *Id.* at 540.

On August 10, 2016, Grothjan received individual therapy in an out-of-cell setting. *Id.* at 336-38. He complained about his housing assignment but denied suicidal intent. *Id.* On August 25, a counselor met with Grothjan at his cell. *Id.* at 332-33. He noted that Grothjan was set to be released from restrictive housing on September 25 and was recommended for placement in the Special Needs Acclimation Program (SNAP) unit, a specialized housing unit for inmates with mental illness. *Id.* However, Grothjan refused an out-of-cell visit. *Id.*

On September 22, Grothjan submitted a request for Haldol, Risperdal, or Thorazine, and a counselor responded that he was scheduled for an appointment with Dr. Eichman. *Id.* at 539. On September 27, a counselor met with Grothjan at his cell. *Id.* at 315-16. He informed Grothjan that he was recommended for the SNAP unit, but Grothjan responded that he was not interested in the SNAP unit and again refused an out-of-cell visit. *Id.* On the same day, Dr. Eichman missed an appointment with Grothjan due to computer issues but renewed his prescription for Buspirone and Paxil. *Id.* at 311-14.

On October 5, 2016, Grothjan submitted a request to reschedule his appointment with Dr. Eichman, and a counselor responded that his appointment had been rescheduled. *Id.* at 530. On October 6, Grothjan told a counselor that he heard voices, but the counselor found he did not present as though he was responding to internal stimulus. *Id.* at 303-04. Grothjan expressed concerns with his housing assignment and

4

refused an out-of-cell visit. *Id.* On October 9, Grothjan sent medical records from the Swanson Center to the mental health unit. *Id.* at 529. On October 11, Grothjan submitted a request for placement in a step-down mental health unit or to return to Pendleton, and a counselor responded that he would discuss it with the doctor. *Id.* at 528.

Also on October 11, Grothjan discussed the medical records from the Swanson Center with Dr. Eichman and asked her to replace Paxil with Effexor. *Id.* at 298-300. She agreed and asked him to choose between Remeron and Buspirone, and Grothjan chose Remeron. *Id.*

Dr. Eichman considered the Swanson Center records, including the diagnosis for bipolar disorder, but did not personally observe the symptoms of bipolar disorder. ECF 104-2 at 6-7, 10. According to Dr. Eichman, bipolar disorder is particularly difficult to diagnose because it may present differently over time and its symptoms are similar to those of other illnesses. *Id.* at 4. Grothjan requested other anti-psychotic medications, but she found them inappropriate because he did not appear to have symptoms of psychosis or bipolar disorder. *Id.* at 6-7.

On October 30, 2016, Grothjan submitted a report that he had not received Remeron since October 23. ECF 104-3 at 525. He submitted repeat requests on November 6 and November 13. *Id.* at 522, 524. On November 7, a counselor met Grothjan at his cell. *Id.* at 267. He complained about his medication but refused an out-of-cell visit. *Id.* On November 8, Grothjan submitted a request for grief counseling due to his ailing grandfather, and a counselor scheduled an appointment with him. *Id.* at 523. On November 16, Dr. Eichman noted that the Remeron prescription had been

5

erroneously discontinued and restarted the prescription. *Id.* at 264. On November 17, a counselor met with Grothjan at his cell and discussed his grandfather. *Id.* at 262-63. On November 28, a counselor again met with Grothjan at his cell because he told correctional staff that he had the desire to hurt himself. *Id.* at 255. However, Grothjan denied suicidal ideation when the counselor arrived. *Id.*

On December 6, 2016, Grothjan was moved to the general population. *Id.* at 254. Three days later, Grothjan received individual therapy in an out-of-cell setting. *Id.* at 251-53. He reported harassment to a counselor, and he was recommended for placement in the SNAP unit. *Id.* On December 19, Grothjan told a counselor that moving to the SNAP unit had improved his mental state only slightly. *Id.* at 242-44. He also stated that he stopped taking his medication and did not want to participate in group therapy. *Id.*

On December 20, Grothjan was moved to restrictive housing for assaulting an officer and received a ninety-day sentence. *Id.* at 237; ECF 104-5 at 1, 5. Four days later, Grothjan assaulted a nurse and received another ninety-day sentence. *Id.* at 2-4. On December 27, Grothjan submitted a request to see a therapist and Dr. Eichman, and a counselor responded that he was scheduled to see Dr. Eichman. ECF 104-3 at 497. On December 31, Grothjan submitted a request to complain of hearing voices and paranoia, and a counselor responded that she would see him when time permitted. *Id.* at 496.

On January 3, 2017, a counselor attempted to meet with Grothjan at his cell, but he refused to engage. *Id.* at 221-22. On January 4, Grothjan submitted a request to see the psychiatrist. *Id.* at 495. On January 10, a counselor met with Grothjan at his cell and

provided journal paper and word searches at his request. *Id.* at 216-17. On the same day, Grothjan requested Risperdal and Lamictal during an appointment with Dr. Eichman. *Id.* at 213-15. Because she observed manic symptoms, she agreed to prescribe Risperdal. ECF 104-2 at 7-8. However, Dr. Eichman did not diagnose Grothjan with bipolar disorder because she had not observed the symptoms over time. *Id.*

Later that day, Grothjan submitted a request for Cogentin to offset the side effects of Risperdal, and a counselor notified Dr. Eichman. ECF 104-3 at 494. On January 11, Grothjan submitted a request to see Dr. Taylor and complained about voices, hallucinations, and paranoia, and a counselor responded that he had recently seen Dr. Eichman. *Id.* at 493.

On January 17, Grothjan assaulted two correctional officers and received another ninety-day sentence. ECF 104-5 at 6-8. On January 23, Grothjan submitted another request for Cogentin, and a counselor responded that she had informed Dr. Eichman. ECF 104-3 at 492. On January 20, a counselor met with Grothjan at his cell. *Id.* at 204-05. On January 26, a counselor attempted to remove Grothjan from his cell for an out-of-cell visit, but Grothjan refused. *Id.* at 193-95.

On February 6, 2017, a counselor met with Grothjan at his cell, and Grothjan suggested that he should not be in restrictive housing because he was seriously mentally ill. *Id.* at 187-88. On February 14, a counselor met Grothjan at his cell - Grothjan reiterated his concerns about restrictive housing, and the counselor agreed to consult Dr. Taylor. *Id.* at 181-82.

The Department of Correction defines seriously mentally ill (SMI) as those who have a diagnosis of bipolar disorder or another mental illness that is clinically severe and results in significant functional impairment. ECF 104-4 at 16. Inmates classified as SMI cannot be placed in restrictive housing for more than thirty days. *Id.* Grothjan did not have an active diagnosis of bipolar disorder, and, according to Dr. Taylor, Grothjan did not exhibit significant functional impairment, including appetite disturbance, difficulty with bathing, using the toilet, or the inability to perform daily living activities. *Id.* At this time, correctional staff determined that, based on his recent misconduct, Grothjan was to remain in restricted housing. *Id.* at 16-17. That same day, on February 14, Dr. Eichman prescribed Cogentin and increased the dosage of Risperdal at Grothjan's request. ECF 104-3 at 178-80.

On March 6, 2017, Grothjan reported that he had swallowed a razor blade. *Id.* at 172-73. However, medical staff was unable to confirm this report with X-rays. *Id.* at 167-68; ECF 104-4 at 17. Dr. Taylor met with Grothjan the following day. ECF 104-3 at 167-68. Dr. Taylor observed demanding, but logical behavior, no signs of mental deterioration, suicidal tendencies, or psychotic symptoms. ECF 104-4 at 17-18. He concluded that Grothjan had reported that he swallowed a razor blade to manipulate his housing assignment. *Id.*

On March 8, a counselor met with Grothjan for an out-of-cell visit. ECF 104-3 at 161-63. On March 20, a counselor met with Grothjan at his cell, and Grothjan reported an improved mental condition. *Id.* at 157-58. He asked about his release from restrictive housing and was told that he would be considered for the SNAP unit. *Id.* On March 29,

Grothjan submitted a request to be moved to the SNAP unit, and a counselor responded that he would be considered upon release from restrictive housing. ECF 114 at 21.

On April 15, 2017, Grothjan cut his left wrist with a razor blade. ECF 104-3 at 149-51. He told Dr. Taylor that he heard voices but that he did not want to die. *Id.* at 139-41. Grothjan also reported that he intentionally put himself in restricted housing to avoid placement in an open dormitory. *Id.* Dr. Taylor placed Grothjan on constant suicide observation. *Id.*

On April 18, Dr. Eichman increased the dosage of Risperdal based on Grothjan's reports of mood swings and auditory hallucinations and recommended a more intensive program. *Id.* at 110-12. Later that day, a counselor met with Grothjan at his cell. *Id.* at 107. On April 30, 2017, Grothjan submitted a request to be removed from suicide observation, and a counselor responded that he would not be removed due to concerns about self harm. ECF 114 at 22. On May 16, Grothjan transferred to the Pendleton Correctional Facility. ECF 104-3 at 18-20.

In his response to the motion for summary judgment (ECF 114), Grothjan states that, at first, Dr. Eichman did not credit his reported symptoms of auditory hallucinations, paranoid delusions, or panic attacks and refused to prescribe him the antipsychotic medication he requested. This refusal persisted even after he provided her with the Swanson Center records. Although she eventually prescribed him Risperdal, Dr. Eichman never changed Grothjan's diagnosis to reflect his conditions of bipolar disorder and schizoaffective disorder.

9

Grothjan further states that he sent at least seven letters to Dr. Taylor regarding his symptoms, his need for individualized therapy, group therapy, and the need for more effective medical care. In the amended complaint (ECF 80), he also explains that, in September 2016, he wrote letters asking Dr. Taylor to visit him to discuss therapy options and he told a counselor that he needed to discuss his medication with Dr. Taylor, but Dr. Taylor did not respond. When he returned to segregation in early 2017, Grothjan wrote Dr. Taylor asking for therapy and to be moved to a mental health unit and told him that he was suicidal, but Dr. Taylor did not respond. On March 6, 2017, after Grothjan swallowed a razor blade, Grothjan told Dr. Taylor in person about his suicidal thoughts and hearing voices. According to Grothjan, Dr. Taylor denied him therapy and would not place him in a mental health program. Grothjan also alleges that Dr. Taylor restricted him from possessing a razor, but did not put him on suicide watch.

Standard of Review

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the non-moving

party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

Discussion

Grothjan alleges that Dr. Eichman and Dr. Taylor acted with deliberate indifference to his mental health needs. Under the Eighth Amendment, inmates are entitled to adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to his medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994.) A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).

Deliberate indifference is a high standard, and is "something approaching a total unconcern for [a prisoner's] welfare in the face of serious risks," or a "conscious, culpable refusal to prevent harm." *Duane v. Lane*, 959 F.2d 673, 677 (7th Cir. 1992) (citations omitted). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that

11

the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (quotation omitted).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (quotation and citations omitted). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697-98 (citations, quotations, and parentheticals omitted). Negligence, incompetence, or even medical malpractice do not amount to deliberate indifference. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004); *Walker v. Peters*, 233 F.3d 494, 499 (7th Cir. 2000).

Furthermore, a prisoner is not entitled to demand specific care, nor is he entitled to the "best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Where the defendants have provided some level of care for a prisoner's medical condition, in order to establish deliberate indifference the prisoner must show that "the defendants'

12

responses to [his condition] were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). A mere disagreement with medical professionals about the appropriate treatment does not amount to an Eighth Amendment violation. *Ciarpaglini v. Saini*, 352 F.3d 328, 331 (7th Cir. 2003).

Dr. Eichman

Grothjan alleges that Dr. Eichman acted with deliberate indifference by refusing to prescribe adequate medication and failing to change his diagnoses even after he provided her with the Swanson Center medical records. In July 2016, Dr. Eichman discounted Grothjan's reported symptoms because she saw no objective signs and was unaware of any history of psychosis. Nevertheless, she increased his dosage of Paxil due to his complaints of anxiety. In October 2016, Dr. Eichman prescribed Effexor at Grothjan's request. She also reviewed the Swanson Center medical records, observed the prescriptions and diagnoses, but declined to make further changes because she did not see signs of bipolar disorder or psychosis. In November 2016, she restarted a prescription that had been erroneously discontinued. In January 2017, Dr. Eichman prescribed Risperdal as requested by Grothjan because she observed signs of mania. However, she did not diagnose Grothjan with bipolar disorder because she had not seen these symptoms over time. In February 2017, Dr. Eichman prescribed Cogentin at Grothjan's request. In April 2017, Dr. Eichman increased the dosage of Risperdal based on Grothjan's reports of mood swings and auditory hallucinations and recommended a more intensive program.

The record clearly reflects that Dr. Eichman was responsive and considered Grothjan's complaints as she diagnosed and prescribed medication for Grothjan, but that she somewhat discounted them based on her observations and medical expertise. Although Dr. Eichman may have recommended a different course of treatment than the Swanson Center, "[m]ere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). This is particularly true considering the intermittent nature of the symptoms of bipolar disorder. Moreover, the record reflects that Dr. Eichman did not discount the complaints entirely, as she adjusted his medication each time she saw Grothjan. Frequently, these adjustments were consistent with Grothjan's requests. Because the record unequivocally indicates that Dr. Eichman acted in accordance with her medical judgment, the motion for summary judgment is granted with respect to Dr. Eichman.

<u>Dr. Taylor</u>

Grothjan alleges that Dr. Taylor also acted with deliberate indifference by refusing to personally meet with him to address his requests for housing accommodations and therapy, as well as his reports of suicidal ideation. With respect to personal contact, Dr. Taylor responds that his role at the Westville Correctional Facility is an administrative role and that, although he had some involvement with Grothjan's treatment, he largely relied upon the mental health staff to address Grothjan's concerns. As the Seventh Circuit has reiterated:

> Public officials do not have a free-floating obligation to put things to rights, disregarding rules (such as time limits) along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen.

*Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). During his incarceration, Grothjan had a constitutional right to adequate medical care, but he was not entitled to personal meetings with Dr. Taylor. While the exact scope of Dr. Taylor's personal involvement with Grothjan's claim is unclear, the record demonstrates that medical staff responded appropriately and reasonably to each of Grothjan's mental health concerns.

Grothjan asserts that he should not have been housed in the general population or restrictive housing. However, the record indicates that, from September 2016 until the April 2017 suicide attempt, medical staff planned to house Grothjan in the SNAP unit but these plans were frustrated by Grothjan's refusal to participate and by repeated assaults on staff. According to the record, medical staff asked about moving Grothjan from restrictive housing, but correctional staff rejected this suggestion based on the conclusion that Grothjan presented a security threat. The record further indicates that, after the suicide attempt, Dr. Taylor responded reasonably by placing Grothjan on suicide watch and transferring him to a more intensive program. Although Grothjan may have wanted a more immediate transfer, the medical staff's efforts to obtain suitable housing for Grothjan did not constitute deliberate indifference.

Grothjan further asserts that Dr. Taylor ignored his requests for adequate individualized or group therapy. However, the record does not suggest that Grothjan's therapy needs were ignored. Rather, the record is replete with examples of Grothjan receiving regular visits with mental health counselors and his frequent refusal of out-of-cell visits. The record also demonstrates that these counselors consistently advised Grothjan to submit medical requests for his mental health needs, that they always responded to these requests, and that they never refused to meet with him. The record further demonstrates that, when offered group therapy, Grothjan refused to participate and medical staff could not offer him group therapy after his placement in restrictive housing.

Additionally, Grothjan asserts that Dr. Taylor did not adequately respond to his reports of suicidal ideation. Specifically, he alleges that he sent Dr. Taylor three letters about suicidal ideation in 2017. Grothjan has not filed these letters with the court, but, even if Dr. Taylor received them as described, Dr. Taylor was entitled to delegate personal interactions with Grothjan to mental health staff and to rely upon their documented observations and assessments. According to the medical records, Grothjan denied suicidal ideation on many occasions following his return to the Westville Correctional Facility, and no indication of suicidal intent appears until Grothjan's report that he swallowed a razor blade on March 6, 2017. Grothjan further asserts that he reported suicidal ideation to Dr. Taylor in person on March 7, 2017. However, after examining Grothjan, Dr. Taylor found that Grothjan's conduct was an attempt to manipulate his housing assignment. This finding was reasonable based on Dr. Taylor's

personal observations, Grothjan's ongoing complaints about his housing, the negative X-ray findings, and the absence of any reports from medical staff about suicidal ideation. In the following weeks, Grothjan did not report suicidal ideation to his counselor; to the contrary, he indicated an improved mental condition. Nevertheless, when Grothjan cut himself and his intent to engage in self harm became clear, Dr. Taylor responded reasonably by placing him on suicide watch and transferring him to a facility with a more intensive program.

In sum, the record does not demonstrate that Dr. Taylor or his medical staff acted with deliberate indifference with respect to Grothjan's requests for housing and therapy or reports of suicidal ideation. Instead, the record unequivocally indicates that medical staff responded reasonably to each of these mental health concerns. Therefore, the motion for summary judgment is granted with respect to Dr. Taylor.

## Conclusion

For these reasons, the court:

(1) GRANTS the motion for summary judgment (ECF 103);

(2) DIRECTS the clerk to enter judgment and to CLOSE this case; and

(3) DENIES as UNNECESSARY the motion for leave to proceed in forma pauperis (ECF 119).

**SO ORDERED**.

ENTERED: February 1, 2019

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT